NO. 4-07-0478          Filed 3/3/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| EQUISTAR CHEMICALS, LP, | ) | Appeal from |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Douglas County |
| HARTFORD STEAM BOILER INSPECTION AND | ) | No. 07L11 |
| INSURANCE COMPANY OF CONNECTICUT, | ) | |
|     Defendant-Appellee. | ) | Honorable |
| | ) | Michael G. Carroll, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Appellant, Equistar Chemicals, LP (Equistar), appeals the trial court's denial of its motion to stay arbitration (710 ILCS 5/2 (West 2006)), and raises two issues before this court on interlocutory appeal:

(1) Whether an initial determination of standing (i.e., whether a party agreed to submit to arbitration) is a predicate question to be resolved by the courts rather than the arbitrators, or whether standing itself is an arbitrable issue;

(2) Whether an insurer subrogee to a party to an arbitration agreement has standing to invoke that agreement to compel arbitration.

In denying Equistar's motion to stay arbitration, the trial court found that, under the circumstances of this case, standing should be decided by the arbitrators rather than by the court. The

trial court also found that even if it were the court's role to determine standing, it would deny the motion to stay arbitration because the insurer subrogee had standing to invoke the agreement to arbitrate. We disagree with the trial court's ruling that it is the arbitrators' role to determine standing in this instance, but we affirm the trial court's denial of the motion to stay arbitration.

## I. BACKGROUND

This interlocutory appeal arises out of a negligence claim raised by appellee, the Hartford Steam Boiler Inspection and Insurance Company of Connecticut (Hartford), against Equistar for damage to a turbine generator in the amount of $950,000. Hartford's insured, Trigen-Cinergy Solutions of Tuscola, L.L.A. (Trigen), owned the turbine generator, which was located at Equistar's ethanol plant in Tuscola, Illinois. Allegedly, one of Equistar's employees negligently "racked off" circuit breakers, causing an arc of electricity that damaged Trigen's turbine generator.

At all times relevant to this appeal, Trigen and Equistar were parties to a contract entitled, "Amended and Restated Energy, Water and Wastewater Services Agreement." The agreement established a commercial relationship between Trigen and Equistar, requiring Trigen to provide steam-water processing, compressed air and electricity services, and water and waste treatment at Equistar's plant. The agreement also contained an arbitration clause that required Trigen and Equistar to resolve

any disputes arising out of or relating to the agreement through arbitration.

When Trigen's turbine generator broke, Hartford paid Trigen $853,442 to repair the damages (the cost of the damages minus Trigen's deductible), under a property-damage coverage. Hartford then filed a demand for arbitration with the American Arbitration Association (AAA), seeking to enter into arbitration with Equistar by virtue of its subrogee status in relation to Trigen and requested compensation in the amount of $853,442. Equistar in turn filed an objection to claimant's standing, the arbitrators' jurisdiction, and the arbitrability of claimant's claim. Then, on April 23, 2007, Equistar filed a motion to stay arbitration. 710 ILCS 5/2(b) (West 2006). Equistar requested that arbitration be stayed until, in addition to other issues, the question of Hartford's standing to invoke the agreement could be resolved.

On May 14, 2007, the trial court denied the motion to stay arbitration in a written order. The court identified the sole issue to be whether Harford, as subrogee insurer to Trigen, had standing to invoke the arbitration clause of the agreement. The court identified the subissue to be whether standing is an "arbitrable" issue that should be decided by the arbitrators rather than by a court. A determination on the subissue was relevant because, if the court found standing to be an arbitrable issue, then the entire matter should be referred to arbitration and the motion to stay arbitration should be directly denied.

- 3 -

The trial court found standing to be an arbitrable issue. However, the court proceeded to find that, even if standing were not an arbitrable issue but rather a predicate question of law to be resolved by the courts, Hartford had standing to compel arbitration by virtue of its subrogee status.

Equistar filed a notice of interlocutory appeal from the trial court's written order under Supreme Court Rule 307(a), which states that a ruling on an injunction is subject to an interlocutory appeal as of right. 188 Ill. 2d R. 307(a). A motion to compel or stay arbitration is analogous to a motion for injunctive relief and therefore is subject to an interlocutory appeal. Royal Indemnity Co. v. Chicago Hospital Risk Pooling Program, 372 Ill. App. 3d 104, 107, 865 N.E.2d 317, 321 (2007). The two issues presented for review are as stated above.

## II. ANALYSIS

### A. Standing To Arbitrate Under Arbitration Clause Should Be Decided by Court, Not Arbitrators

Equistar argues, and we agree, that the court and not the arbitrators should resolve the issue of Hartford's standing. The language of the statute governing whether the court should stay arbitration--section 2 of the Uniform Arbitration Act--supports that the court, and not the arbitrators, should determine the issue of standing, or whether the parties had an agreement to arbitrate:

"Proceedings to compel or stay arbitration. (a) On application of a party showing an agreement [to arbitrate], and the opposing

- 4 -

party's refusal to arbitrate, the court shall order the parties to proceed to arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied.

(b) On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. That issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the court shall order the parties to proceed to arbitration."

710 ILCS 5/2(a), (b) (West 2006).

When a party to an arbitration agreement files a suit in circuit court to stay arbitration proceedings, one concern is the efficient and economical resolution of disputes. Accordingly, "[w]here the language of the arbitration agreement is clear, and it is apparent that the dispute *** falls within the scope of the arbitration agreement, the court should decide the arbitrability issue and compel arbitration." Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr, 124 Ill. 2d 435, 445, 530 N.E.2d

- 5 -

439, 443 (1988). Likewise, where it is clear the dispute is outside the agreement, the court should rule against arbitration. The key here is the agreement, that is, what the parties have agreed to submit to arbitration. Donaldson, 124 Ill. 2d at 445, 530 N.E.2d at 443. Where the question is unclear, however, it "'is a question of contract application and interpretation for the arbitrator, not the court, and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity.'" Donaldson, 124 Ill. 2d at 448, 530 N.E.2d at 445, quoting Gold Coast Mall, Inc. v. Larmar Corp., 298 Md. 96, 107, 468 A.2d 91, 97 (1983). In some cases, deferring to the arbitrator may slow down the process, but a primary purpose of the Uniform Arbitration Act is to enforce parties' agreements to arbitrate, even if the result is piecemeal litigation. Donaldson, 124 Ill. 2d at 448-49, 530 N.E.2d at 445. Initially deferring to the arbitrators will not preclude a court from later considering whether the arbitrators exceeded their powers. Donaldson, 124 Ill. 2d at 450, 530 N.E.2d at 445-46.

In Donaldson, a senior manager of a commodity futures broker sued the broker for severance pay, unpaid expenses, a bonus based on 15% of the income generated by his office, and an amount equal to 5% of the commissions produced by recruits he brought to the company. The manager filed a request for arbitration with the Chicago Board of Trade (CBOT). The broker sued in circuit court to stay arbitration on the basis the claims arose

out of the manager's employment relationship and not out of business the manager or broker transacted at the CBOT. The Illinois Supreme Court held the claims for severance pay and unpaid expenses clearly arose out of his contract of employment and clearly did not "arise out of Exchange business," as required by the arbitration agreement. Donaldson, 124 Ill. 2d at 451, 530 N.E.2d at 446. The trial court should have denied arbitration on those claims. However, the claims for a percentage of the income generated by the office and produced by the recruits should be determined by the arbitrator. "It is precisely because it is unclear whether these claims arose out of the employment contract or exchange business that the arbitrator must initially determine the arbitrability issue." Donaldson, 124 Ill. 2d at 451, 530 N.E.2d at 446.

As cited above, when a party files suit to stay arbitration proceedings, the Uniform Arbitration Act initially confers jurisdiction on the courts to determine whether the parties have agreed to arbitrate a dispute. 710 ILCS 5/2(a), (b) (West 2006). The Donaldson court held that there are certain situations where the court should defer its decision-making power to the arbitrator, such as where whether the parties have agreed to arbitrate the dispute is unascertainable, reasonably debatable, or "unclear." Donaldson, 124 Ill. 2d at 448, 530 N.E.2d at 445. Under the circumstances of this case, where the question of whether the parties have agreed to arbitrate is currently before the court, we see no reason to delay the arbitration process by

- 7 -

removing the question from the court's jurisdiction and sending the question to the arbitrators.  Here, the issue of standing is clear, and therefore the court should decide the issue.  In this particular case, the court must determine the status of Hartford's standing by answering the question, "Does a subrogee (Hartford) have a right to invoke an arbitration agreement signed by the subrogor (Trigen) and a third party (Equistar)?"  The question of whether Hartford has standing by operation of subrogation law is a question largely independent from the language of the particular agreement at issue here.  The arbitrators would have no special skill at resolving this issue as compared to the court.

The trial court relied on the language in the arbitration clause of the parties' agreement in deciding that the arbitrators should resolve the issue of standing.  The arbitration clause stated:

> "Section 20.4. Arbitration.  The parties agree that any and all disputes, controversies, or claims arising out of, involving or relating to this Agreement shall be referred, settled[,] and finally resolved by arbitration conducted in accordance with the Rules of the American Arbitration Association ('AAA') ***.  ***  [T]he arbitrators shall not have the power to amend or add to this agreement.  Subject to such limitation, <u>the</u>

> decision <u>of</u> <u>the</u> <u>arbitrators</u> (<u>including</u> <u>the</u>
> <u>decision</u> <u>that</u> <u>the</u> <u>dispute</u> <u>is</u> <u>arbitrable</u>)
> shall be final and binding upon the parties,
> and shall be enforceable in a court of compe-
> tent jurisdiction.  The decision of the arbi-
> trators shall include the determination of
> cost allocation between the parties."  (Em-
> phasis added.)

We disagree with the trial court's finding that the language in the arbitration clause that states, "the decision of the arbitrators (<u>including</u> <u>the</u> <u>decision</u> <u>that</u> <u>the</u> <u>dispute</u> <u>is</u> <u>arbitrable</u>) shall be final and binding upon the parties" (emphasis added), leads to the logical deduction that (1) the arbitrators shall make decisions concerning issues of arbitrability and (2) the courts shall have no role.  Instead, we read this statement to mean that, provided the arbitrators were to decide an "unclear" question of arbitrability, their decision would be binding.  This statement merely clarifies the degree of authority to be given to the arbitrators' decision; it does not expand the arbitrators' jurisdiction.  Had the parties intended for <u>all</u> matters of arbitrability to be decided by the arbitrators, the parties should have put a short, declarative sentence in the arbitration provision stating as much, such as the following:  "All matters of arbitrability are to be decided by the arbitrators."  See, <u>e.g.</u>, <u>Bahuriak v. Bill Kay Chrysler Plymouth, Inc.</u>, 337 Ill. App. 3d 714, 719, 786 N.E.2d 1045, 1050 (2003) ("courts have

recognized that parties are free to agree to submit the question of arbitrability itself to the [arbitrator]").

As such, we disagree with the trial court's finding that the question of whether Hartford has standing to compel arbitration should be decided by the arbitrators.  For the reasons that follow, however, we nevertheless affirm the trial court's denial of the motion to stay arbitration.

### B. Hartford's Standing To Compel Arbitration Based on Subrogee Status

Equistar argues that Hartford's status as Trigen's subrogee did not give Hartford standing to compel Equistar to arbitration under the authority and terms of Equistar's arbitration agreement with Trigen.  Critical to our analysis, Equistar concedes in its reply brief that it does not challenge Hartford's right to pursue its subrogated claim; it merely contends that the proper forum for Hartford's claim is a court of law, not an arbitration panel.

Equistar argues the question of forum is important because different rights are afforded for each respective forum: in forgoing the judicial process, the parties would be agreeing to forgo the right to a jury, the rules of evidence, the right to bring counterclaims, the right of contribution, and the right to an appeal.  See, for example, Melena v. Anheuser-Busch, Inc., 219 Ill. 2d 135, 150-51, 847 N.E.2d 99, 108-09 (2006).  Like any valid contract, a legitimate agreement to arbitrate requires an offer, an acceptance, and consideration.  See Melena, 219 Ill. 2d at 151, 847 N.E.2d at 108.  "[A] party to an agreement is charged

- 10 -

with knowledge of and assent to the agreement signed." Melena, 219 Ill. 2d at 150, 847 N.E.2d at 108. A party cannot be forced to arbitrate unless it has agreed to submit to arbitration. Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 181 Ill. 2d 373, 382, 692 N.E.2d 1167, 1172 (1998).

Equistar argues that the only two parties that agreed to arbitrate are Equistar and Trigen. Equistar notes that it makes sense that Equistar and Trigen would want to arbitrate claims; they have a long-standing and ongoing contractual relationship, they interact on a daily basis, and each knows the resources of the other. The same cannot be said of the relationship between Equistar and Hartford, with which Equistar contends it never agreed to arbitrate. Equistar points to the language of the agreement in support of its argument that the agreement only contemplated arbitration between Equistar and Trigen, not Hartford. The agreement defined its parties as Equistar and Trigen. The definition did not include successors, assigns, insurers, or subrogees. In fact, the agreement expressly limited Equistar's and Trigen's ability to bring third parties under the authority of the agreement:

"Section 14.1. Except as expressly provided in this Agreement, neither party shall be the other's agent or fiduciary for any purpose whatsoever and shall not be authorized to act for, financially commit, speak for or represent the other in any dealings

with third parties. Except as expressly provided in this Agreement, neither party shall have the authority or right to incur obligations of any kind in the name, or for the account, of the other party, nor to commit or bind the other party to any contract, and except as expressly provided in this Agreement, each party agrees that it neither has nor will give the appearance or impressions of possessing any legal authority to bind or commit the other in any way."

Similarly, section 20.2 of the agreement, the arbitration clause, forbids either party from assigning its rights under the agreement without the consent of the other. Section 20.9 states that the agreement can only be modified by a writing signed by both parties.

Hartford argues that Equistar's above-noted references to the language contained in the agreement that indicates the agreement to arbitrate is exclusively between Trigen and Equistar are irrelevant because Hartford does not contend that its right to compel arbitration with Equistar was based in the agreement itself. Rather, Hartford contends that its right to compel Equistar to arbitration is conferred by operation of subrogation law, not by the agreement.

As alluded to above, the right to compel arbitration typically stems from contract and generally may not be invoked by

a nonsignatory to the contract. <u>Ervin v. Nokia</u>, Inc., 349 Ill. App. 3d 508, 512, 812 N.E.2d 534, 539 (2004). However, courts have recognized several contract-based theories under which a nonsig-natory to an agreement may be bound to the arbitration agreements of others, such as (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing or alter ego, (5) estoppel, and (6) third-party-beneficiary status. <u>Ervin</u>, 349 Ill. App. 3d at 512, 812 N.E.2d at 539, referencing <u>Caligiuri v. First Colony Life Insurance Co.</u>, 318 Ill. App. 3d 793, 800, 742 N.E.2d 750, 756 (2000); <u>Howells v. Hoffman</u>, 209 Ill. App. 3d 1004, 1007-09, 568 N.E.2d 934, 936-37 (1991) (regarding third-party-beneficiary status). Illinois courts have reasoned that, if nonsignatories may be <u>bound</u> to arbitrate under these circum-stances, then it would seem to follow as a corollary that the same types of theories could afford a basis for a nonsignatory to <u>invoke</u> an arbitration agreement signed by others. <u>Ervin</u>, 349 Ill. App. 3d at 512, 812 N.E.2d at 539. The parties in the instant case debate whether the doctrine of subrogation is a theory, in addition to those theories already listed in <u>Ervin</u>, that affords a nonsignatory a basis to invoke an arbitration agreement signed by others.

Whether the doctrine of subrogation confers the right to a subrogee (<u>i.e.</u>, Hartford) that is a nonsignatory to an arbitration agreement between the subrogor (<u>i.e.</u>, Trigen) and a third party (<u>i.e.</u>, Equistar) to compel the third party to arbi-trate pursuant to the terms of the arbitration agreement is a

- 13 -

matter of first impression for Illinois courts.  Nationally, no case has yet held that a subrogee may invoke an arbitration agreement signed by others.  Only one case, Valley Casework, Inc. v. Comfort Construction, Inc., 76 Cal. App. 4th 1013, 1023, 90 Cal. Rptr. 2d 779, 786 (1999), has directly addressed the issue. The Valley court held that a nonsignatory's insurer-subrogee status was not an exception to the general rule that a nonsignatory to an arbitration agreement cannot invoke the agreement. Valley, 76 Cal. App. 4th at 1024, 90 Cal. Rptr. 2d at 786. However, in Solomon v. Consolidated Resistance Co. of America, Inc., 97 A.D.2d 791, 468 N.Y.S.2d 532 (1983), the court addressed the question of whether a nonsignatory's insurer-subrogee status bound the insurer-subrogee to the arbitration agreement and answered in the affirmative.  The Solomon court stated that if the named plaintiffs (subrogors) would be required to submit the dispute to arbitration, then the insurer, as subrogee, would be similarly bound.  Solomon, 97 A.D.2d at 792, 468 N.Y.S.2d at 533. We are not jurisdictionally bound by either the Valley or the Solomon decision.  And, given Illinois's aforementioned policy that theories sufficient to bind nonsignatories to arbitration agreements signed by others are generally sufficient to afford nonsignatories a basis to invoke arbitration agreements signed by others, we do not find Valley more persuasive than Solomon simply because it, like the instant case, dealt with invoking an arbitration agreement rather than being bound to an arbitration agreement.  Instead, we look to the general issue raised in both

Valley and Solomon as to whether the doctrine of subrogation allows a nonsignatory subrogee to "stand in the shoes" of its subrogor as to the arbitration agreement with respect to the claim being pursued.

Subrogation is governed by principles of equity. Dix Mutual Insurance Co. v. LaFramboise, 149 Ill. 2d 314, 319, 597 N.E.2d 622, 624 (1992). It allows one who had involuntarily paid a debt or claim of another to succeed to the rights of the other with respect to the claim or debt so paid. Dix, 149 Ill. 2d at 319, 597 N.E.2d at 624. A party "who asserts a right of subrogation must step into the shoes of, or be substituted for, the one whose claim or debt [it] has paid and can only enforce those rights the latter could enforce." Dix, 149 Ill. 2d at 319, 597 N.E.2d at 624. In cases dealing with insurance, an insurer's right to subrogation allows it to be put in the position of the insured to pursue recovery from third parties responsible to the insured for the loss that the insurer both insured and paid. See, for example, Valley, 76 Cal. App. 4th at 1023, 90 Cal. Rptr. 2d at 786.

Though case law on the subject is extremely sparse, it does seem as though case law and policy favor requiring a subrogee's claim against a third party to be tried within the limitations agreed to by the subrogor and the third party. In Sompo Japan Insurance, Inc. v. Alarm Detection Systems, Inc., No. 03-C-2322 (N.D. Ill. August 6, 2003) (2003 WL 21877615), which involved a contract governed by Illinois law, the court held that

the contract's forum-selection clause obligated a subrogee to litigate its claim in the forum named in the contract between the subrogor and defendant.

We agree with the rationale expressed in Solomon. Solomon, 97 A.D.2d 791, 468 N.Y.S.2d 532. If Trigen would have been required to arbitrate the negligence action against Equistar, then Hartford should be similarly bound. Distinguishing between whether Hartford has a "right" or an "obligation" to arbitrate is merely a matter of semantics where Hartford is required to arbitrate. Valley is not persuasive. The Valley court's rationale seemed to be based on a simple reluctance to expand the established list of exceptions to the rule preventing nonsignatories from invoking arbitration agreements where there was no precedent for doing so. Valley, 76 Cal. App. 4th at 1024, 90 Cal. Rptr. 2d at 786.

Equistar argues that there is no mutuality of agreement between Hartford and Equistar. In other words, Equistar asserts that while the trial court allowed Hartford to compel Equistar to arbitrate, Equistar would not have been allowed to compel Hartford to arbitrate. Equistar cites no case law for the proposition that it would not have been allowed to compel arbitration against Hartford. In fact, Solomon, which found that the insurer subrogee was obligated to arbitrate with the defendant under the authority of the arbitration agreement governing the relationship between the subrogor and the defendant, seems to hold the opposite. Solomon, 97 A.D.2d 791, 468 N.Y.S.2d 532.

- 16 -

Equistar also argues that arbitration between Equistar and Hartford would not be proper under the circumstances because issues of equitable apportionment and multiforum litigation risks may be present. Equistar believes it may have a third-party-contribution claim against the company responsible for the control on the turbine generator, which should have shut down the generator's engine before the alleged damage occurred. Equistar would not be able to compel these third parties to arbitrate (Board of Managers of the Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc., 183 Ill. 2d 66, 78, 697 N.E.2d 727, 733 (1998)); hence, the multiparty conflict could be forced to proceed in different forums.

Despite the fact that there is a general policy supporting joinder and the resolution of multiparty conflicts in a single forum, once a trial court determines that a valid arbitration agreement exists, the court must compel arbitration, even if litigation between two parties who are not signatories to the agreement to arbitrate must proceed in a different forum. IKO Chicago, 183 Ill. 2d at 74, 697 N.E.2d at 731. In that case, the trial court could either stay the litigation pending arbitration (or vice versa), or if the issue is severable, the court could stay the litigation for that issue only. IKO Chicago, 183 Ill. 2d at 74-75, 697 N.E.2d at 731-32.

Finally, Equistar argues that Hartford's negligence claim does not relate to or arise out of the agreement between Equistar and Trigen. In other words, regardless of whether a

nonsignatory subrogee may invoke an arbitration agreement signed by other parties, Equistar and Trigen did not agree to arbitrate the particular issue of negligence or gross negligence (and therefore Hartford cannot arbitrate the claim).  This is a pure question of "arbitrability."  Roubik, 181 Ill. 2d at 382, 692 N.E.2d at 1172 ("arbitrability" speaks to whether the parties to an agreement agreed to arbitrate the specific issue).

As stated above, where it is clear whether the issue falls under the scope of the arbitration agreement, the court should make the initial arbitrability determination.  Bahuriak, 337 Ill. App. 3d at 718, 786 N.E.2d at 1049.  However, where it is unclear whether the issue falls under the scope of the arbitration agreement, or where the arbitration agreement expressly provides that the arbitrator should decide the arbitrability of the claims, the arbitrator should make the decision.  Bahuriak, 337 Ill. App. 3d at 718-19, 786 N.E.2d at 1049-50.

The agreement between Trigen and Equistar stated that Trigen would provide power to Equistar's ethanol plant through the use of its turbine generator.  The turbine generator would be located at Equistar's plant and Equistar employees would necessarily work with it.  Hence, it is at least arguable that a negligence action arising out of Equistar's treatment of Trigen's turbine generator "related to" the agreement between Equistar and Trigen.  As such, the trial court correctly referred the question of whether the negligence claim was "arbitrable" to the arbitrators.

Because Hartford's subrogee status gave it standing to invoke the arbitration clause, the trial court did not err in denying Equistar's motion to stay arbitration.

### III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH and STEIGMANN, JJ., concur.